The opinion of the court was delivered by
DeBlanc, J.
On the 15th of June 1872, J. L. Gill, acting as defendant’s agent, subscribed and endorsed two notes of each $833.33¿ c., payable to the order of his principal, one on the 1st of February, the other on the first of April 1873. Those notes passed into plaintiff’s possession, and — according to the allegations of his petition — before maturity and for a valid consideration.
The defence is that Y. H. Gill delivered to plaintiff his steamboat “ Flavilla,” to be run by him until enough money should be realized to liquidate the notes sued upon and other debts, and that her earnings were sufficient for the purpose,
In this Court, the prescription of five years is pleaded in bar of plaintiff’s action on the note which matured on the 1st of February 1873, and — unless its course has been interrupted — that plea must prevail, the citation in this case having been served on defendant on the 23d of March 1878.
The consideration of the notes, and the power of J. L. Gill to draw and endorse them are not disputed, and the questions presented are: ■
1. Did the earnings of the Flavilla suffice to pay those notes, and—
2. If not, is plaintiff’s action prescribed as to that which matured in February ?
J. L. Gill, who is a brother of defendant, swore — on the trial — and we, here, transcribe his own words — that “ he had turned over the steamer Flavilla to' the plaintiff, to be run by him in the upper river trade, as he himself knew nothing of that trade. The understanding and agreement between them was that the earnings of the boat were to go to the payment of its indebtedness, and that — in said indebtedness— the notes sued on were included. Under that agreement, the boat was in defendant’s possession for about three months, and — under his management — made four trips, the gross earnings of which J. L. Gill estimates at over twelve thousand dollars. This estimate is based, partly *1208 on alleged admissions of the plaintiff and partly on conjectural calculations. He never — he said — leased the boat to Sale & Murphy.
Captain Scovel swore that he had no dealing with either J. L. or V. H. Gill, that the steamer Elavilla was turned over to him by Sale' & Murphy, to be — as it was — run for exclusively their account, that they paid the salaries-of the officers of the boat and other bills due by it, and received all its earnings. He did not render the settlement asked by J. L. Gill, for the reason that he had not been employed by him, but by Sale & Murphy, who advanced him fifteen hundred dollars, to settle for wages already due to the crew, when he took charge of the boat: its earnings were not sufficient to pay the current expenses and the money so .advanced. The boat sunk twice and they had to pay damages for the injury done to the- cotton on those occasions, but he did not state how much was paid.
J. L. Gill swore that he did not know whore Captain Scovel got the money with which he paid the crew. A member of the firm of Sale & Murphy swore that J. L. Gill agreed with them that — if they would furnish the money to pay the crew — they would be the agents of the Boat, Scovel would go on it as captain, and that — -out of its earnings — their advance, if made, would b'e the first paid. They made the advance, employed Scovel as captain at a fixed and stipulated salary ; a satisfactory statement of every trip was given to them by the Clerk ; that the season was bad and they did not get their money back.
What became of the statements which N. W. Murphy said had been regularly made to them by the Clerk of the Boat and which were satisfactory to them ? Are they still in existence ? Have they been entered on any book ? Are they or the book accessible ? Those statements would have been proper substitutes for the conjectures which fill this record.
Can we base our decree on plaintiff’s declaration as to the amount of what was received for freight — not by him — but by the firm of Sale & Murphy — -whilst the boat was under the control of the latter, as agents of Gill ? What did he declare ? That, when he took charge of the Elavilla, it was owing over three thousand dollars; their first trip up was light; he did not recollect what it amounted to, but thought it may have been from five to eight hundred dollars ; on another trip, which he also states to be the first, and which — we presume — was its return from the upper river, they brought’ out 1025 bales of cotton, on which their share of charges received was three thousand and seventy-five dollars ; they, thereafter carried to Shreveport a load of nine hundred bales, at from $2.50 to $6 by bale to New Orleans. How many at $2.50 and how many at $6, we are not informed. This cotton was reshipped to New Orleans at $1.50 per bale. After this, they made another trip ; had on board a considerable freight, the charges on which he esti *1209 mates at from $2500 to $3000, but .the boat sunk, a good deal of that freight was lost and no charge paid. On their trip from Hood’s landing to Shreveport, they brought fifty bales, and- — from upper Bed Biver to Bargeton — five hundred. The costs of transportation on these two lots is not mentioned.
From the evidence adduced on the trial, we believe that the profits realized from the several trips did not exceed.................$7600 00 That, not including the damages which may have been paid for freight injured and lost, the expenses of the boat were at least.................................................... 6231 98
leaving a balance of.........................'...............$1368 02, less than required to satisfy the claim of Sale & Murphy, and that claim — it was expressly agreed — was the first to be paid out of the earnings of the Flavilla. The declarations of Murphy and Seovel that the steamer did not make enough to pay its current expenses and the claim of Sale & Murphy stand uncontradieted and contradict the plea of payment, which is not supported by the evidence.
“He, who contends that he is exonerated, must prove the payment or the fact which has produced the extinction of the obligation,” and this defendant has failed to do. C. C. 2232 (2229). Had those notes been paid, would he have left them in plaintiff’s possession, without even demanding their return or their cancellation ? That is highly improbable.
We think — as held by the district judge — that J. L. Gill, in giving the notes and in endeavoring to effect a settlement with Seovel in regard to said notes, was acting as the duly authorized agent of his brother, and — in that capacity — he acknowledged his brother’s indebtedness, and promised that it would be satisfied out of funds which he expected to recover from a suit then pending at New Orleans.- Not only did he, by words, acknowledge that indebtedness, but he did so by an act to which he himself has testified : in February 1873, when the first of the notes sued upon became due, he placed plaintiff in possession of the steamer Flavilla, for the purpose of securing the payment of those notes and of another claim, and that possession — which—in law and in fact — was a standing acknowledgment — continued until the latter part of April of that year. In Montgomery et al vs. Levistones, this Court held that “ the possession by the creditor of property of his debtor, with the consent of the latter, for the purpose of paying himself out of its hire, is an acknowledgment of the debt which interrupts prescription.” 8. A. 145. 2. Troplong, Nos. 534, 618. C. C. 3461 (3424).
In this case, prescription was suspended from the first of February until the last day of the month of April, 1873, and had not been acquired *1210 when, citation was served on the defendant. Under these circumstances»the plea of prescription can not be maintained.
It is, therefore, ordered, adjudged and decreed that the judgment of the lower court is annulled, avoided and reversed, and, proceeding to-render such judgment as should have been rendered below,
It is further ordered, adjudged and decreed that plaintiff — M. L. Scovel — do have judgment against the defendant — V. H. Gill — and recover of him the sum of sixteen hundred and sixty-six dollars and sixty-six and two-thirds cents, with interest thereon at the rate of eight per cent per annum, as follows : on one half of said sum from the first of February eighteen hundred and seventy-three, and on the balance from the first of April of the same year — (1873).
It is lastly ordered that the costs of the lower court and of the appeal be paid by defendant.